**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ECO TOUR ADVENTURES, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 14-2178 (BAH) |
| | Judge Beryl A. Howell |
| RYAN ZINKE, *in his official capacity as Secretary of the Interior*, et al. | |
| Defendants. | |

## MEMORANDUM OPINION

The plaintiff, Eco Tour Adventures, Inc. ("Eco Tour"), a Wyoming-based small business, seeks rescission of two concession contracts for cross-country ski touring services in Grand Teton National Park ("the disputed contracts") that were awarded to two incumbent concessioners, despite a ruling from the U.S. Court of Federal Claims ("CFC") holding that the incumbents' proposals were improperly considered by the National Park Service (the "NPS"). *See Eco Tour Adventures, LLC v. United States* ("*Eco Tour I*"), 114 Fed. Cl. 6, 40 (2013) (determining that "NPS acted arbitrarily and capriciously in concluding that [incumbent concessioners'] proposals were responsive" and, as a result, plaintiff "was prejudiced"). Despite the CFC's ruling, NPS subsequently proceeded to award the disputed contracts to the incumbents, prompting the plaintiff to initiate this lawsuit against the Secretary of the Interior, the Department of the Interior, the Director of the National Park Service, and the National Park Service (collectively, "the defendants" or "NPS"), under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.*, requesting declaratory and injunctive relief, including requiring NPS to award the contracts to plaintiff. Compl. at 27-28 (Prayer for Relief), ECF No.

1.[1]  The parties have now filed cross motions for summary judgment.  Pl.'s Mot. Summ. J.,

("Pl.'s Mot."), ECF No. 24; Defs.' Cross-Mot. Summ. J. ("Defs.' Mot."), ECF No. 27.  For the

reasons outlined below, the plaintiff's motion for summary judgment is granted with respect to

its request for declaratory relief finding that NPS violated the APA, but denied without prejudice

in all other respects, subject to supplemental briefing consistent with this Memorandum Opinion,

and NPS's cross-motion for summary judgment is denied.

## I.      BACKGROUND

The background to this case is described in detail in the CFC decision holding that NPS

"acted arbitrarily and capriciously" and in breach of "the implied contract for bids to be fairly

and honestly considered," when the agency, by its conduct, thwarted the plaintiff's "substantial

chance" to receive the disputed contracts, *Eco Tour I*, 114 Fed. Cl. at 43, as well as this Court's

Memorandum Opinion denying the defendants' motion to dismiss in this case, *Eco Tour*

*Adventures, Inc. v. Jewell* ("*Eco Tour II*"), 174 F. Supp. 3d 319 (D.D.C. 2016).  This factual and

procedural history as relevant to the pending motions is summarized below.

### A.      NPS PROSPECTUS AND EVALUATION OF PLAINTIFF'S BID AS
###          "BEST PROPOSAL"

In December 2012, NPS issued a prospectus soliciting proposals for three ten-year

concession contracts, only two of which, GRTE024-13 ("Contract 24") and GRTE032-13

("Contract 32"), are at issue in this case,[2] to provide guided cross-country ski touring services in

Grand Teton National Park.  Admin. Record ("AR") 5–210 (Prospectus, dated December 20,

2012, issued by NPS Intermountain Region).[3]  The prospectus "included detailed instructions

---

[1]      Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes as defendant the current Secretary
of the Interior, Ryan Zinke, for former Secretary Sally Jewell.
[2]      The plaintiff did not submit a bid for the third contract, GRTE025-13.
[3]      The complete administrative record ("AR") totals 1491 pages comprised of: (1) 1420 pages from the record
before the CFC, Notice Supp. Filing, ECF No. 23; and (2) 71 pages of supplemental material concerning events that
occurred after the termination of the CFC case, with Bates stamps prefaced with "000," Certified List of AR, ECF

setting forth the protocol for submitting proposals and the selection factors to be used by the NPS to evaluate proposals." *Eco Tour I*, 114 Fed. Cl. at 14. These factors included: the offeror's commitment to "protecting, conserving, and preserving resources of the park area"; the offeror's commitment to "providing necessary and appropriate visitor services at reasonable rates"; the background and experience of the offeror; the "financial capability of the offeror to carry out its proposal"; and the offeror's "proposed minimum franchise fee." AR 43–57 (Prospectus outlining the identical selection factors for Contracts 24 and 32).

At the time of this solicitation, the services under Contract 24 were being provided by Jackson Hole Mountain Resort ("JHMR") and under Contract 32 by Hole Hiking Experience ("HHE"), both of which, as incumbent concessioners, were designated by NPS as "preferred offerors," a designation the plaintiff does not contest. AR 24 (Prospectus, noting that NPS "has determined the [] existing Concessioners are qualified contracts and therefore the existing Concessioners are Preferred Offerors for the new Contracts"). Under NPS regulations, this designation allows preferred offerors a "right of preference," which allows them to match any better offer from a new bidder so long as they initially "submit a responsive proposal to th[e] Prospectus" that satisfies the minimum requirements established by the NPS. AR 24 (Prospectus, citing 36 C.F.R. § 51).

The plaintiff was founded in 2008 and provides "auto-based interpretative tours into Grand Teton and Yellowstone national parks." AR 730 (Letter, dated March 20, 2013, from Taylor Phillips, plaintiff's President, to John Wessels, Regional Director, NPS Intermountain Region). Hoping to expand its business, the plaintiff submitted bids for Contracts 24 and 32.

No. 13. Excerpts from the AR, totaling 1081 pages, were submitted to this Court. *See* Notice of Filing Appendix Containing Excerpts from the AR, Ex. 2, AR Part A (containing excerpts from pages 1-883), ECF No. 32-2, and Ex. 3, AR Part B (containing excerpts from pages 884-1420; 00011-00083), ECF No. 32-3.

AR 724–1093.  An evaluation panel, convened from March 25, 2013 to April 5, 2013,

determined that the plaintiff submitted proposals with the highest cumulative score for both

contracts.  AR 1272–1302 (undated Panel Evaluation Summary for Contract 24); AR 1317-1342

(undated Panel Evaluation Summary for Contract 32); *see also* AR 1188 (Letter, dated June 20,

2013, from Regional Director, NPS Intermountain Region to Taylor Phillips, plaintiff's

President, stating "[y]our proposal has been evaluated as the best proposal for" Contract 24); AR

1189 (same for Contract 32).

For Contract 24, NPS received timely proposals from Eco Tour, JHMR, and two other

offerors.  AR 1277 (Panel Evaluation Summary for Contract 24 listing Eco Tour, JHMR, and

two redacted names as offerors).  The panel reviewed each proposal against a total of 12 primary,

secondary and subsidiary selection factors, as laid out in the prospectus, and assigned a score for

each factor.  AR 1277.  Eight of the plaintiff's twelve responses were rated "excellent" or "very

good" and, of the remaining four responses, two were rated "good" and two were rated "fair."

AR 1278–1302 (Panel Evaluation Summary).  In contrast, JHMR's responses received no

"excellent" or "very good" ratings, but only seven "good" and five "fair" ratings.  *Id.*  In fact, the

plaintiff's score on each factor was higher than JHMR's score, with the exception of selection

factor three, for which both received a score of 2.5.  AR 1277.  Based on the plaintiff's better

evaluations, the plaintiff's total evaluation score for Contract 24 was 20.5 (out of a total 27),

which was seven points higher than JHMR's, at 13.5.  AR 1277.

For Contract 32, NPS received timely proposals from Eco Tour, HHE, and two other

offerors.  AR 1317 (Panel Evaluation Summary for Contract 32 listing Eco Tour, HHE, and two

redacted names as offerors).  Again, nine of the plaintiff's twelve responses, were rated

"excellent" or "very good" and, of the remaining three responses, two were rated "good" and one

was rated "fair." AR 1318–42. In contrast, HHE's responses received no "excellent" ratings, with four "very good," three "good" and five "fair" ratings. *Id.* Similar to the evaluation for Contract 24, the plaintiff received a higher score than the incumbent in every category, except for selection factor three, for which both received a 2.5. AR 1317. The plaintiff's total evaluation score for Contract 32, was 21.5 (out of a total 27), which was six points higher than HHE's, at 15.5. AR 1317.

The evaluation panel noted a number of deficiencies in both JHMR and HHE's proposals, largely related to the fourth primary selection factor regarding "The Financial Capability of the Offeror To Carry Out its Proposal." AR 1294 (Contract 24); AR 1334 (Contract 32). JHMR, the panel noted, failed to submit "a current balance sheet" or "a current credit report," provided incomplete or inconsistent answers "on the Initial Investment form," and failed to submit "a bank statement as requested . . . ." AR 1295–98. HHE, the panel noted, submitted incomplete annual financial reports, failed to provide any explanation for the balance sheet it provided, and made "numerous mistakes" on some of the required forms. AR 1337, 1339. These omissions prompted the panel to express "concern[] with the financial position of the Offeror [HHE]." AR 1336.

On June 20, 2013, NPS sent letters to the plaintiff, JHMR, and HHE informing the companies of the panel evaluations. The plaintiff learned that its "proposal ha[d] been evaluated as the best proposal for this opportunity; however, in accordance with 36 C.F.R. § 51.26, the preferred offeror, whom the Director has determined to be eligible to exercise a right of preference to the award of the contract, [would] have the opportunity to match the terms of [its] proposal." AR 1188 (Letter, dated June 20, 2013, from John Wessels, Regional Director, Intermountain Region to the plaintiff). The incumbent concessioners were told that "[a]lthough

the panel determined your proposal to be responsive to the minimum requirements of the Prospectus, the panel did not find your proposal to be the best proposal submitted for this solicitation." AR 1190–92 (Letter, dated June 20, 2013, from NPS to JHMR); AR 1193–95 (Letter, dated June 20, 2013, from NPS to HHE). Notwithstanding the finding of the NPS Regional Director that the incumbents' proposals were "responsive to the minimum requirements of the Prospectus," AR 1190, 1193, these letters detailed "items" that each incumbent was required to "expand on . . . to bring the quality of your response up to the level of the best proposal," AR 1192, 1195. JHMR, for example, was told by the Regional Director to submit a current balance sheet, credit report and bank statement, and HHE was told to submit a complete set of financial statements, to clarify its revenue and expense projections, a corrected Pro Forma without "mathematical errors," and "a current bank statement with a list of current liabilities," since HHE had failed to submit a balance sheet that corresponded with the bank statement it submitted, as required by the prospectus. *Id.*

Despite the cited defects in their bid proposals, the NPS Regional Director told the incumbents that they were "eligible to exercise the right of preference for the award of the new Concession Contract" under 36 C.F.R. § 51.32, assuming that they provided the information missing from their bids and committed to matching the "elements of [the] better offer" submitted by the plaintiff. AR 1190–92; AR 1193–94.[4] The incumbents quickly agreed to match the terms

---

[4]    In describing these letters, NPS states that "[t]he June 2013 letters to Jackson Hole and Hole Hiking did not reflect a final decision by the Regional Director that [their] submissions were 'responsive.'" Defs.' Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J ("Defs.' Opp'n") at 5, ECF No. 27-1. This characterization conflicts with the quoted language of the actual letters, which expressly told both incumbent concessioners that their proposals were "responsive to the minimum requirements of the Prospectus." AR 1190–94. In fact, the author of the letters conceded that "much of the language used in this letter could be interpreted to mean that [he] had made final determinations on these issues," but he nonetheless indicated that he had not read the proposals or the panel evaluations at the time he signed the letters, nor did he intend the letters "to represent [his] final decision as to whether the proposals were responsive." Defs.' Mot., Ex. 3, Decl. of John Wessels, dated August 13, 2013 ("Wessels Decl."), ¶¶ 11, 14, ECF No. 27-3.

of the plaintiff's better offer.  AR 1204–07 (Letter, dated June 28, 2013, from JHMR to NPS);

AR 1400–01 (Letter, dated July 8, 2013, from HHE to NPS).

The plaintiff also responded to the NPS letter and raised concern over NPS's reliance on

its regulation at 36 C.F.R. § 51.32 because "it appears that at least one of the preferred offerors

failed to submit a responsive proposal" and, therefore, that incumbent would "ha[ve] no right of

preference, under 36 C.F.R. § 51.31, and ha[ve] no right to match [the plaintiff]'s proposal. "

AR 1242 (Letter, dated July 3, 2013, from plaintiff to Chief of Concessions, NPS Intermountain

Region).  NPS disagreed, citing the definition of a "responsive proposal" from 36 C.F.R. § 51.3,

AR 1244–45 (Letter, dated July 10, 2013, from Chief of Concessions, NPS Intermountain

Region to plaintiff's attorney), and expressing the view that any omitted information in the

incumbents' proposals was "not considered material" and "the lack of quality and omissions

were reflected in lower scores," AR 1267–68 (Letter, dated July 29, 2013, from Chief of

Concessions, NPS Intermountain Region to plaintiff).

### B.   PLAINTIFF'S CHALLENGE BEFORE CFC

The plaintiff promptly brought a challenge before the CFC to NPS's determination that

the incumbent concessioners' proposals were responsive, claiming that the incumbent

concessioners' failure to include all information required by the prospectus rendered their

proposals not "responsive" within the meaning of the governing NPS regulation at 36 C.F.R. §

51.3, and that NPS acted arbitrarily and capriciously, and breached its implied contractual

obligation to consider bids fairly and honestly, by allowing the incumbents to match the better

terms proposed in the plaintiff's bids, despite the incumbents unresponsive proposals.  *Eco Tour*

*I,* 114 Fed. Cl. at 23–24.  The plaintiff sought injunctive and declaratory relief in the form of a

remand directing NPS to review its decisions that the incumbents' proposals were responsive and

that the incumbents were entitled to review proprietary information in the plaintiff's proposal in

order to match plaintiff's better terms, and also sought reimbursement for the costs incurred in preparing its bids for the disputed contracts, attorneys' fees, and litigation costs. *Id.* at 19. On August 19, 2013, the CFC stayed the case "based on NPS's assertion that the source-selection authority had not rendered final decisions with respect to the award of the disputed contracts." *Id.* at 18 n.8.

### C.    NPS FINDING OF "RESPONSIVE PROPOSALS" BY INCUMBENTS

Although the June 20, 2013 NPS letters to the plaintiff and incumbent concessioners expressly stated that the plaintiff offered the "best proposal" and the incumbents' proposals, which omitted specific items required by the prospectus, were nonetheless "responsive," only after the CFC had stayed the plaintiff's challenge, did the NPS take steps to formalize these findings with an explanation. Specifically, on August 30, 2013, the NPS Chief of Concessions, Intermountain Region, recommended that the Acting Director of the Intermountain Region officially find that the plaintiff had submitted the "best proposal" and, while acknowledging that the incumbent concessioners "did not provide all of the information requested in the Prospectus," that the Acting Director also find "that all [] of the proposals [submitted] are responsive." AR 1273 (Memorandum, dated August 30, 2013, from Chief of Concessions to Acting Director, Intermountain Region for Contract 24); AR 1312–51 (same for Contract 32).[5] Regarding Contract 24, the recommendation noted that JHMR's bid did not contain the requested balance sheet, credit report, or bank statement, AR 1305–06, and had incomplete information as to anticipated purchases, AR 1306. Nevertheless, these omissions were deemed "immaterial" because "the panel was able to evaluate the proposal" without the required documents, AR 1306.

---

[5]    John Wessels left his position as the Regional Director of NPS's Intermountain Region during the consideration of the bid proposals for the disputed contracts. Defs.' Mot., Ex. 4, Decl. of Jennifer Parker, dated July 28, 2016 ("Parker Decl.") ¶ 23 n.3, ECF No. 27-4.

Regarding Contract 32, the NPS Chief of Concessions acknowledged that HHE's bid "did not contain some of the information requested by the [NPS]," since HHE filed incomplete annual financial reports and "ambiguous" current liability information on its balance sheets," AR 1345, but, similarly to the recommendation for Contract 24, recommended finding that HHE's omissions or mistakes were immaterial, and therefore HHE's bid was "responsive." AR 1345.[6]

The Acting Regional Director approved the recommendation, AR 1273 (Memorandum, dated August 30, 2013, from Chief of Concessions to Acting Director, NPS Intermountain Region, bearing acting director's signature approving proposed responsiveness findings for Contract 24); AR 1313 (same for Contract 32). Following this approval, on September 4, 2013, the Chief of Concessions recommended finding that both incumbents "ha[d] amended [their] proposal[s] to match the better terms and conditions of the best proposal," thus requiring that the incumbents be awarded the disputed contracts under § 51.32. AR 1352–59 (Source Selection Memorandum, dated September 4, 2013, from Chief of Concessions to Acting Director, Intermountain Region for Contract 24); AR 1384–1420 (Source Selection Memorandum, dated September 4, 2013, from Chief of Concessions to Acting Director, Intermountain Region for Contract 32). These recommendations were likewise accepted by the Acting Director for the NPS Intermountain region, as reflected by that Acting Director's signature on the source selection recommendation memoranda. AR 1353 (Source Selection Memorandum signed by Acting Director for Contract 24); AR 1385 (same for Contract 32).

---

[6]     This memorandum from the NPS Chief of Concessions did not include other information provided by the evaluation panel or set out in the Regional Director's June 20, 2013 letter to HHE, including that HHE's proposal contained "numerous mistakes on the Pro Forma income statement," failed to provide a balance sheet corresponding to the bank statement, AR 1195 (Letter, dated June 20, 2013, from John Wessels, Regional Director, NPS Intermountain Region, to HHE), and failed to raise the panel's concern "with the financial position of" HHE, AR 1336 (Panel Evaluation Summary for Contract 32).

**D.       THE CFC DECISION**

The CFC subsequently lifted the stay based on NPS's notice that, consistent with the

August 30 and September 4, 2013 memoranda, the "source-selection authority had [] rendered

final decisions with respect to the award of the disputed contracts, [and] on September 4, 2013,

decided to award the disputed contracts to the incumbent concessioners." *Eco Tour II*, 114 Fed.

Cl. at 18.  Then, on November 26, 2013, the CFC issued its decision granting judgment in the

plaintiff's favor, finding that the incumbents had excluded material information from their initial

proposals, which were therefore unresponsive within the meaning of 36 C.F.R. § 51.3, and that

the incumbents therefore were ineligible for the opportunity to match the better terms offered by

the plaintiff.  *Id.* at 42 n. 18 (noting that sealed version of opinion was issued on November 26,

2013 "direct[ing] the entry of final judgment in favor of plaintiff" but deferring entry of that

judgment pending final disposition of plaintiff's "bid preparation costs").  In particular, the CFC

disagreed with the recommendations in the August 30, 2013 memoranda and instead concluded

that "each of the NPS's materiality determinations, as well as its resulting responsiveness

determinations, was arbitrary, capricious, and an abuse of discretion." *Id.* at 23; 33–34.

Moreover, because the plaintiff had "submitted responsive proposals that received the highest

cumulative scores of any of the proposals received by NPS," the CFC concluded that NPS's

arbitrary and capricious actions were prejudicial since the plaintiff "demonstrated a 'substantial

chance' that it would have received the disputed contracts if not for the Park Services' arbitrary

and capricious responsiveness determination with regard to the proposals of [the incumbents]."

*Id*. at 43.

Although the CFC was clear that the plaintiff's bids were not fairly considered by NPS,

the CFC determined that it lacked jurisdiction to provide the equitable and declaratory relief

requested by the plaintiff.  *Id.* at 21, 42; *see also Eco Tour II,* 174 F. Supp. 3d at 325–29.

Specifically, because the disputed concession contracts were not "procurement contracts" for purposes of the Tucker Act, 28 U.S.C. § 1491, *Eco Tour I,* 114 Fed. Cl. at 21, the CFC held that, after considering conflicting authority on the issue, it lacked jurisdiction to award the plaintiff equitable relief, and thus the plaintiff could recover at the CFC only the costs incurred for its initial bid. *Id.* at 41–42. Consequently, the CFC denied the plaintiff's requested remand to the agency because doing so was perceived to "tread[] . . . into the realm of injunctive relief," *id.* at 42. Thereafter, upon consideration of the parties' stipulation regarding the plaintiff's costs stemming from its unsuccessful bids for the disputed contracts, J. Stip. Re: Money Damages Owed Under December 12, 2013 Op. & Order & J. Request For Entry of J., *Eco Tour I*, No. 13-cv-532-LJB (Fed. Cl. April 15, 2014), ECF No. 58, the CFC entered judgment, on April 17, 2014, in favor of the plaintiff and awarded $36,250 in bid preparation costs, Judgment, *Eco Tour I*, No. 13-cv-532-LJB (Fed. Cl. April 17, 2014); *see also Eco Tour II*, 174 F. Supp. 3d at 322–23.

### E. PLAINTIFF'S NON-LITIGATION EFFORTS TO OBTAIN REVIEW OF DISPUTED CONTRACTS AWARDS

After the CFC's judgment was entered, but before the disputed concession contracts with the incumbent concessioners were executed, the plaintiff engaged in multiple steps short of expensive litigation to remedy the denial of the contracts to the plaintiff. Pl.'s Mot. Ex. A, Second Decl. of Taylor Phillips, plaintiff's President and owner, dated May 30, 2016 ("Phillips Second Decl.") ¶ 14, ECF 24-1 (stating that plaintiff "was unable to afford the expense of further litigation against the federal government" after the CFC ruling "due in large part to the very illegal action at issue in this matter").[7] These steps included trying to enlist the assistance of the

---

[7] As support for their pending motions, the parties rely on declarations that are not in the AR. These declarations may nevertheless be considered since, as the D.C. Circuit has recognized, extra-record evidence may be used "in cases where relief is at issue." *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989). The issue of injunctive relief is generally not raised in the administrative proceedings below and, consequently, "there usually will be no administrative record developed on these issues." Steven Sark & Sarah Wald, *Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Actions,* 36 Admin. L. Rev. 333, 345 (1984). Thus, "it will

Wyoming congressional delegation, which efforts prompted congressional inquiries requiring NPS to explain its actions. *See, e.g.*, AR 00012–14 (Letters, dated June 20, 2014, from Regional Director, NPS Intermountain Region to Wyoming Congresswoman Cynthia Lummis and Wyoming Senators John Barrasso and Michael B. Enzi, summarizing "the decisions the [NPS] has made related to" plaintiff). The plaintiff also attempted "extensive and lengthy efforts to persuade NPS to comply with the law." Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem."), at 9, ECF No. 24.

On June 20, 2014, NPS rejected the plaintiff's proposal "to forego payment" on the CFC judgment "in exchange for a contract," indicating that "this is not possible as the [CFC] entered judgment against the United States . . . ." AR 00011 (Letter, dated June 20, 2014, from Regional Director, NPS Intermountain Region to plaintiff's President). NPS further stated its plan, having "carefully considered all possible resolutions," to "fully comply with the [CFC's] decision and pay your bid preparation costs and a negotiated amount for your attorney fee." *Id*. While acknowledging that plaintiff was "very passionate about this matter and [was] disappointed with the outcome," the agency offered, apparently by way of consolation, that "the [CFC]'s decision has resulted in policy changes to strengthen proposal requirements and evaluation procedures." *Id*. Explanation of the specific "policy changes" that NPS has adopted are not entirely clear from the record. NPS informed the Wyoming congressional delegation by letter sent that same day, that though "NPS did not always consider an offeror's failure to produce one of many financial documents requested in the prospectus as a material failure that would render the proposal

---

often be necessary for a court to take new evidence to fully evaluate" claims "of irreparable harm . . . and [claims] that the issuance of the injunction is in the public interest." *Id*. Further, "there is nothing improper in receiving declarations that 'merely illuminate[] reasons [for the agency's actions] obscured but implicit in the administrative record.'" *Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996) (quoting Appeal of Bolden, 848 F.2d 201, 207 (D.C. Cir. 1988)); *see also Camp v. Pitts*, 411 U.S. 138, 141-43 (1973) (holding courts may "obtain from the agency, either through affidavits or testimony . . . additional explanation of the [contemporaneous] reasons for the agency decision"). To the extent the declarations provide such illumination, the Court properly considers them.

unresponsive, . . . [i]n the future, NPS may be required to determine an offer ineligible for consideration if the offeror fails to provide all financial information required by the prospectus." AR 00012-14 (Letters from Regional Director, NPS Intermountain Region to the Wyoming congressional delegation). Less than a month later, on July 16, 2014, NPS executed Contract 24 and Contract 32 with JHMR and HHE, respectively. AR 00022, 00056.

**F.    THE INSTANT LAWSUIT**

After "locat[ing] counsel who would agree to take [the case] on a pro bono basis because it could not afford additional litigation," Pl.'s Opp'n to Defs.' Cross-Mot. and Reply to Defs.' Opp'n to Pl.'s Mot. Summ. J. ("Pl.'s Opp'n") at 40, ECF No. 28, the plaintiff filed the instant action, alleging that NPS violated the APA by misinterpreting and misapplying its own regulations, Compl. ¶¶ 47–51, despite the "clear and unequivocal terms of the regulations which apply" and the CFC's "clear finding that NPS's conduct was illegal," *id.* ¶¶ 2, 4. Given the CFC's view that it lacked authority to issue injunctive relief in the form of rescission of the disputed contracts, the plaintiff seeks injunctive and declaratory relief in this Court. *Id.* ¶¶ 4–5 (seeking "an order . . . declaring that the two contracts awarded to NPS's longtime incumbent contractors are illegal and thus void[, as well as] an injunction requiring the defendants to . . . award the two contracts to Eco Tour for their full 10-year terms.").

NPS initially moved to dismiss the plaintiff's complaint for lack of standing and for failure to state a claim, contending that the plaintiff should be precluded from pursuing equitable and declaratory relief having already "voluntarily elected to receive reimbursement of its bid preparation costs in resolving its earlier claim" and having elected to pursue relief in the CFC when an injunction was available in district court. *Eco Tour II*, 174 F. Supp. 3d at 332–33. This Court rejected these arguments, finding "no substantial inconsistency between the monetary award the plaintiff voluntarily accepted in connection with its earlier action before the CFC and

13

the plaintiff's present request for injunctive and declaratory relief in this Court." *Id*. at 335.

Contrary to NPS's claim that the plaintiff would receive a windfall if granted the award of the

concession contracts after having received its bid costs, the Court held that "to the extent deemed

necessary[,] any contracts awarded under this action could address any prior partial relief

received by Eco Tour." *Id.* (internal quotation marks omitted). Moreover, the Court pointed out

the obvious flaw in NPS's position that the plaintiff "elected" to pursue monetary relief before

the CFC rather than injunctive relief, noting that "NPS had not yet finalized its decision to award

the disputed contracts to the incumbent concessioners . . . during the pendency of the

proceedings before the CFC" and, thus, the plaintiff could not have sought an injunction at that

time. *Id.* at 334. Further, "even assuming such relief was available at the time Eco Tour initially

filed suit in the CFC," the Supreme Court, in a related context, had held "that parties bringing

claims against the federal government may separately seek monetary and injunctive relief in

sequential actions before the CFC and the district courts." *Id.* at 334–35 (citing *United States v.*

*Tohono O'Odham Nation*, 563 U.S. 307, 318 (2011)). Although "the defendants may yet

demonstrate that the plaintiff is not entitled to relief under the APA," the Court concluded that

the relief available to the plaintiff from the CFC was not complete relief, and thus the plaintiff is

not "barred entirely from seeking complete relief for the defendants' allegedly arbitrary and

capricious actions." *Id.* at 336.

The parties' cross motions for summary judgment are now ripe for review.

## II.     LEGAL STANDARDS

### A.     SUMMARY JUDGMENT STANDARD UNDER FEDERAL RULE OF CIVIL PROCEDURE 56

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when

the court finds "that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." FED. R. CIV. P. 56(a), (e)(3); *see Tolan v. Cotton*, 134 S. Ct.

1861, 1866 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). The

first part of the Rule 56 summary judgment standard regarding the absence of disputed material

facts, however, is irrelevant in APA cases since "'the district judge sits as an appellate tribunal'"

and "[t]he entire case on review is a question of law.'" *Rempfer v. Sharfstein*, 583 F.3d 860, 865

(D.C. Cir. 2009) (*quoting Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir.

2001). As such, "the complaint, properly read, actually presents no factual allegations, but rather

only arguments about the legal conclusion to be drawn about the agency action." *Id*. (*quoting*

*Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

Consequently, "[g]enerally speaking, district courts reviewing agency action under the APA's

arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate

courts resolving legal questions." *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085,

1096 (D.C. Cir. 1996); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 171 (D.C.

Cir. 2013) (noting, in APA cases, that "determining the facts is generally the agency's

responsibility, not ours").

Judicial review is limited to the administrative record, since "[i]t is black-letter

administrative law that in an [APA] case, a reviewing court should have before it neither more

nor less information than did the agency when it made its decision." *CTS Corp. v. EPA*, 759

F.3d 52, 64 (D.C. Cir. 2014) (internal quotation marks omitted); *see* 5 U.S.C. § 706 ("[T]he court

shall review the whole record or those parts of it cited by a party . . . ."); *Fla. Power & Light Co.*

*v. Lorion*, 470 U.S. 729, 743 (1985) (noting, when applying arbitrary and capricious standard

under the APA, "'[t]he focal point for judicial review should be the administrative record already

in existence . . . .'" (quoting *Camp v. Pitts,* 411 U.S. 138, 142 (1973))); *Citizens to Pres. Overton*

*Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971) (noting "review is to be based on the full administrative record that was before the [agency] at the time" of the challenged decision).

## B.     STANDARD OF REVIEW UNDER THE APA

An agency action, finding or conclusion challenged under the APA must be set aside upon finding that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When a challenged agency action is based on the application or operation of a regulation, the agency's interpretation of its own ambiguous regulation is generally given substantial judicial deference. *See Auer v. Robbins*, 519 U.S. 452, 463 (1997); *Drake v. F.A.A.*, 291 F.3d 59, 68 (D.C. Cir. 2002). Given the deference owed to agency's interpretation of its own ambiguous regulation, a plaintiff challenging this interpretation carries a "heavy burden in advancing [that] claim." *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig. — MDL No. 1993*, 709 F.3d 1, 11 (D.C. Cir. 2013).

This general rule on deference has limits, however, and is unwarranted when, for example, the agency's "interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013) (quoting *Chase Bank USA, N. A. v. McCoy*, 131 S. Ct. 871, 880 (2011)); *see also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("[W]e must defer to the [agency]'s interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.") (internal quotation marks omitted). An agency interpretation that conflicts with an unambiguous regulation is "substantively invalid" because "to defer in such a case would allow the agency 'to create *de facto* a new regulation.'" *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1208 (2015)(quoting *Christensen v. Harris County*, 529 U. S. 576, 588

(2000)); *see Huerta v. Ducote*, 792 F.3d 144, 153 (D.C. Cir. 2015)(noting that agency action "unhinged from the regulation's plain text" is not entitled to deference).  Likewise, deference need not be accorded to the agency's interpretation that "does not reflect the agency's fair and considered judgment on the matter in question," *Aue*r, 519 U.S. at 462, such as when the agency's interpretation is "unreasonable," *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 343 (D.C. Cir. 2011), or "'when it appears that the interpretation is nothing more than a convenient litigating position, or a post hoc rationalization advanced by an agency seeking to defend past agency action against attack,'" *Rhea Lana, Inc. v. DOL*, 824 F.3d 1023, 1030-1031 (D.C. Cir. 2016)(quoting *Christopher*, 132 S. Ct. at 2166)).

Finally, although an agency may amend or repeal its own regulations and is entitled to deference in interpreting ambiguous regulations, "an agency is not free to ignore or violate its regulations while they remain in effect."  *Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978)); *see also Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) ("Federal agencies must follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions.").  As a result, an agency's action is "arbitrary and capricious if the agency fails to 'comply with its own regulations.'"  *Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d at 1009 (quoting *Environmentel, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)).

## III.    DISCUSSION

The plaintiff argues that NPS's decision to award the contracts to the incumbent concessioners was "directly contrary to explicit law" and that "NPS's own regulations very clearly required NPS to award the two contracts to Eco Tour because [it] had submitted the best

proposal." Pl.'s Mem. at 1. As relief, the plaintiff urges the Court to enter a declaratory judgment that "NPS violated the law, acted arbitrarily and capriciously and abused its discretion in awarding the contracts at issue to" the incumbent concessioners, Compl. at 27 (Prayer For Relief), and to grant injunctive relief by rescinding the contracts as "void as a matter of law," and "directing NPS to comply with its obligations . . . and award the contracts at issue to" plaintiff, *id*. NPS counters that, under applicable regulations, the agency was "lawfully" permitted to "issue the contracts to the incumbent concessioners pursuant to the September 4, 2013 award decision." Defs.' Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J ("Defs.' Opp'n") at 30–31, ECF No. 27-1. NPS further argues that, even if this Court rejects the agency's reading of its own regulations and finds that the final award of the disputed contracts to the incumbent concessioners was arbitrary and capricious, the plaintiff should still be denied equitable relief. The NPS reasons, in a rehash of its unsuccessful motion to dismiss, that the plaintiff has already elected monetary damages as its remedy and, consequently, has no entitlement to injunctive relief. *Id.* at 16–17, 30–31.

Analysis of the parties' cross motions for summary judgment begins with the plaintiff's APA challenge to NPS's final award of the disputed contracts, and the NPS's request to reconsider the denial of its prior motion to dismiss. The Court finds, consistent with the holding of the CFC, that NPS violated the APA in awarding the disputed contracts to the incumbent concessioners and, further, that NPS's request for reconsideration is without merit. The plaintiff's entitlement to injunctive relief, however, raises significant issues neither raised nor addressed by the parties about whether the incumbent concessioners are required parties, under Federal Rule of Civil Procedure 19, for the purposes of fashioning appropriate equitable relief.

### A. PERMITTING AMENDMENT TO INCUMBENT CONCESSIONERS' BIDS WAS ARBITRARY AND CAPRICIOUS

The parties agree that the CFC's holding regarding the non-responsiveness of the incumbents' bid proposals is binding. Pl.'s Mem. at 12 (noting that "ruling by the CFC that the incumbents' proposals were non-responsive has *res judicata* effect and NPS is collaterally estopped from trying to now re-litigate this exact same issue."); Defs.' Opp'n at 18 ("Defendants acknowledge that Eco Tour has prevailed on the merits of the claim it litigated before the CFC that NPS erred in treating as responsive the initial bids of the incumbent concessioners."). The issue before this Court is the parties' dispute whether, notwithstanding the CFC holding, the NPS's award to the incumbent concessioners of the disputed contracts complied with applicable regulations. The plaintiff contends that these regulations barred the NPS from awarding the disputed contracts to the incumbent concessioners because "NPS cannot award the contracts to offerors who submitted non-responsive proposals." Pl.'s Mem. at 11, 15–17. By contrast, NPS argues that "the plaintiff's interpretation of [the] regulations . . . is not reasonable and certainly is not the only permissible interpretation of that regulation." Defs.' Reply Supp. Cross-Mot. Summ. J. ("Defs.' Reply") at 7, ECF No. 31. According to NPS, the agency was "*required* to award the contracts to the incumbent concessioners because they timely submitted amended proposals and their amended proposals matched the terms of [the plaintiff]'s offer." Defs.' Opp'n at 21 (citing 36 C.F.R. § 51.32) (emphasis added).

Thus, the legality under the APA of NPS's actions in awarding the disputed contracts to the incumbents turns on whether the agency properly applied governing statutory provisions and its own regulations to permit the incumbent concessioners to amend their bid proposals in two ways: to make those proposals responsive and to match the plaintiff's better offer, rather than

rejecting the non-responsive proposals.  Review of the relevant regulatory framework makes clear that NPS's reading of the governing statute and its own regulations is untenable.

### 1.    Overview of Relevant Statutes and NPS Regulations

NPS's solicitation of concession contracts is controlled by statute and in more fully articulated regulations. While NPS does not rely on the statute to explain its bidding process, the pertinent statutory language helps illuminate the plain meaning of the agency's regulations.  At the time of the events at issue, the National Park Service Concessions Management Act of 1998 required the Secretary to use a competitive selection process, which included the public solicitation of proposals meeting the requirements of a published prospectus, to identify the best concession proposal.  16 U.S.C. § 5952 (1), (2).  Under the Act, the minimum terms for the concession contract must be set out in the prospectus, along with other pertinent information such as the selection factors.  *Id.* § 5952(3).[8]  The consequence of failing to meet the terms of the prospectus is clear, with the agency instructed that "[n]o proposal shall be considered which fails to meet the minimum requirements as determined by the Secretary," *id.* § 5952(4)(A), and, similarly, requiring the Secretary to "reject any proposal, regardless of the franchise fee offered" that "is not responsive to the objectives of protecting and preserving resources of the unit of the National Park System and of providing necessary and appropriate facilities and services to the public at reasonable rates," *id.* § 5952(4)(B).  Further, the Secretary is barred from "execut[ing] a concessions contract which materially amends or does not incorporate the proposed terms and conditions of the concessions contract as set forth in the applicable prospectus," and if such

---

[8]        The statute governing NPS concession contracts was, at the time of the events at issue, codified in Title 16 of the U.S. Code but, in December 2014, recodified in a Title 54 for "National Park Service and Related Programs." Pub. Law. 113-287, § 2(a), 128 Stat. 3093.

material amendments "are considered appropriate," the Secretary must "resolicit offers for the concessions contract incorporating such material amendments or changes," *id*. § 5952(4)(D).

The Act plainly disfavors giving preferential renewal right to incumbents, providing that "the Secretary shall not grant a concessioner a preferential right to renew a concessions contract, or any other form of preference to a concessions contract," except for narrowly defined types of contracts in specified circumstances. *Id.* § 5952(7)(A). For incumbent concession contract holders, the Secretary may grant a right of renewal only if the incumbent has "operated satisfactorily during the term of the contract" and "submitted a responsive proposal for a proposed new contract which satisfies the minimum requirements established by the Secretary," *id.* § 5952(8)(C). This preferential right of renewal "shall allow a concessioner . . . the opportunity to match the terms and conditions of any competing proposal which the Secretary determines to be the best proposal . . . ." *Id.* § 5952(7)(C).

Consistent with the statute, NPS regulations require "a public solicitation process" for a concession contract, which process "begins with the issuance of a prospectus that invite[s] the general public to submit proposals for the contract." 36 C.F.R. § 51.4(a). The prospectus must include, among other things, "the minimum requirements of the concession contract," and "a statement identifying each principal selection factor for proposals . . . and secondary factors . . . and the weight and relative importance of the [factors] in the selection decisions." *Id.* § 51.5(a). By the time the prospectus is issued, the director is also required to have identified incumbent concessioners who are "preferred offerors," which status allows them to exercise a right of renewal if certain conditions are met. *Id.* § 51.28 ("[T]he director will determine whether a concessioner is a preferred offeror in accordance with this part no later than the date of issuance of a prospectus for the applicable new concession contract."). On expiration of the specified

period to submit proposals, NPS "appl[ies] the selection factors" to the proposals received "by assessing each timely proposal under each of the selection factors . . . and . . . assign[ing] a score that reflects the determined merits of the proposal." *Id.* § 51.16. Following evaluation and scoring of the proposals, "the responsive proposal with the highest cumulative point score will be selected by the Director as the best proposal." *Id.* § 51.16. The "concession contract will be awarded to the offeror submitting the best responsive proposal." *Id.* § 51.31.

Importantly, the language of § 51.31 limits award of a contract to a "responsive" proposal, which is defined in the regulations as "a timely submitted proposal . . . [that] agree[s] to all the minimum requirements of the proposed concession contract and prospectus and [that] provide[s] the information required by the prospectus." *Id.* § 51.3. The determination of whether a proposal is responsive must be made "[p]rior to or as of the date of the selection of the best proposal." *Id.* § 51.13. The regulations are absolutely clear that the Director "must reject any proposal received" that "is not a responsive proposal." *Id.* § 51.18.[9]

Generally, "[a]n offeror may not amend or supplement a proposal after the submission date." *Id.* § 51.15. Limited amendment to a bid proposal is permitted in only two circumstances. First, an amendment to a bid proposal after expiration of the proposal period is permitted when there has been "a general failure of offerors to understand particular requirements of a prospectus or a general failure of offerors to submit particular information required by a prospectus." *Id.* In that circumstance, the Director may permit amendment "limited to modifying particular aspects of proposals" with the noted deficiencies so long as "the Director provides all offerors that submitted proposals a similar opportunity to amend or supplement their proposals." *Id.* Second, an amendment to a bid proposal is permitted after expiration of the proposal period when "a

---

[9]      The prospectus published by NPS for the disputed contracts mirrors this language and makes clear that "[o]nly an Offeror submitting a responsive proposal is eligible to be awarded the new concession contract." AR 27.

proposal other than the responsive proposal submitted by a preferred offeror is the best proposal submitted for a qualified concession contract." *Id.* § 51.32. In this second circumstance, the Director must "give the preferred offeror an opportunity to match the terms of the better offer." *Id.* This "opportunity," however, is restricted to a preferred offeror, which "must submit a responsive proposal . . . if the preferred offeror wishes to exercise a right of preference." *Id.* § 51.30. Thus, the preferential right to match a better offer is dependent on submission of a "responsive proposal," a criterion further emphasized in yet another regulation, stating that "[i]f a preferred offeror fails to submit a responsive proposal, the offeror may not exercise a right of preference." *Id.* § 51.31. Outside of these two limited circumstances, the relevant regulations do not permit amendments to proposals after expiration of the specified period for bid submissions. *Id.* § 51.15.

In sum, these straightforward regulations make clear that, absent a circumstance in which no offerors have submitted a responsive proposal or in which the incumbent concessioner has submitted a responsive proposal not deemed the "best," NPS is precluded from permitting amendment of bids after the submission period has expired. *Id.* § 51.15. Both the governing statute and regulations require that NPS reject non-responsive proposals, which also are ineligible for any preferential right of renewal.

### 2. NPS Violated Both the Governing Statute and Regulations

The CFC, in its thorough analysis, concluded that both incumbent concessioners' bids were non-responsive, while rejecting NPS's argument that "[the plaintiff]'s proposal suffered from the same defect, and should likewise be rejected as non-responsive." *Eco Tour I*, 114 Fed. Cl. at 29–33. Due to the CFC's ruling, NPS concedes error in its August 30, 2013 decision deeming the incumbents' initial bid proposals responsive. Defs.' Opp'n at 30. Given that the incumbent concessioners' initial proposals were not responsive, NPS was required to reject the

proposals.  *See* 16 U.S.C. 5952(4)(B); 36 C.F.R. § 51.18.  Furthermore, NPS regulations

prohibited the incumbent concessioners from amending their proposals after expiration of the

proposal period, *see* 36 C.F.R. §§ 51.15, 51.32, and due to their non-responsive proposals, the

incumbents were not entitled to a preferential right of renewal or the opportunity to amend their

bids to meet the better offer.  16 U.S.C. § 5952 (8)(C)(ii).

Indeed, NPS makes no effort to justify permitting such amendment based on a "general

failure" of the bidders to submit responsive applications, as outlined in § 51.15, since the

plaintiff submitted responsive proposals for Contracts 24 and 32.  As for permitting the

incumbents to exercise a right of preference and amend their proposals under § 51.32, the

incumbents were not eligible to exercise any right of preference because their proposals were not

responsive in the first instance.  Despite NPS's argument that "the Court should defer to the

agency's interpretation of" its own regulations, Defs.' Reply at 9–10, such deference is owed

only when the regulation at issue is ambiguous, *Decker*, 133 S. Ct. at 1337.  These regulations

are clear.

NPS nonetheless urges that § 51.32 should be read to permit incumbents to amend their

proposals to make them responsive to a prospectus.  Defs.' Opp'n at 16; *see also id*. at 21 (citing

§ 51.32 as "requir[ing]" NPS "to award the contracts to the incumbent concessioners because

they timely submitted amended proposals and their amended proposals matched the terms of Eco

Tour's offer.").  As support, NPS cites the second sentence of this regulation, which "provides

that '[i]f the preferred offeror duly amends its proposal within the time period allowed by the

Director, and the Director determines that the amended proposal matches the better terms and

conditions of the best proposal, then the Director must select the preferred offeror for an award

of the contract upon the amended terms and conditions, subject to other applicable requirements

of this part.'" *Id.* (quoting § 51.32). NPS not only fails to address the overall restriction in the last clause of the sentence referring to "other applicable requirements of this part," which constrains its reading of § 51.32, but also fails to address the immediately preceding sentence of this same subsection, which expressly limits the scope of the second sentence by restricting preferred offerors eligible to take advantage of the right of preference to those that have already submitted a responsive proposal. Specifically, the first sentence of § 51.32 states*:*

> "If the Director determines that a proposal other than the *responsive* proposal submitted by a preferred offeror is the best proposal submitted for a qualified concession contract, then the director must advise the preferred offeror of the better terms and conditions of the best proposal and permit the preferred offeror to amend its proposal to match them."

§ 51.32 (emphasis added).

The text of § 51.32 is unambiguous and cannot support NPS's interpretation of the regulation. The first sentence of the regulation clearly limits the scope of § 51.32 to "responsive proposal[s] submitted by a preferred offeror," and also limits amendments permitted by the right of preference to matching "the better terms and conditions of the best proposal." Neither of those conditions were met here. First, the initial offers submitted by the incumbent concessioners were non-responsive and thus do not constitute a "responsive proposal submitted by a preferred offeror" under § 51.32. Second, the amendments NPS attempts to justify under this subsection were not limited to matching the better terms of the plaintiff's offer, but include amendments to make the incumbent concessioners' proposals responsive. By permitting such amendments to be made by the incumbent concessioners, NPS violated the unambiguous language of the relevant regulations, rendering this decision arbitrary and capricious. *See Nat'l Envtl. Dev. Ass'ns*, 752 F.3d at 1009 (holding an agency's action is "arbitrary and capricious if the agency fails to 'comply with its own regulations'" (quoting *Environmentel, LLC*, 661 F.3d at 85)). Thus, even if § 51.32 were "the relevant regulation governing the contract award to the

incumbent concessioners," Defs.' Opp'n at 21, as NPS contends, this regulation does not sanction the agency's action.

Indeed, adoption of NPS's proposed reading of these regulations would make §§ 51.30 and 51.31 superfluous. If the regulations authorized the Director to allow incumbent concessioners to amend non-responsive proposals in order to exercise a right of preference, then § 51.31, which prohibits "a preferred offeror [who] fails to submit a responsive proposal" from "exercis[ing] a right of preference," would have no purpose because a preferred offeror could always amend a proposal to make it responsive. The same reading would obviate the pre-requisite in § 51.30 that "[a] preferred offeror must submit a responsive proposal pursuant to the terms of an applicable prospectus for a qualified concession contract if the preferred offeror wishes to exercise a right of preference," since the same offeror could simply amend its proposal at any time to meet the terms of the prospectus.

In sum, after the CFC found the incumbents' proposals to be non-responsive, NPS persisted on the path of awarding the disputed contracts to the incumbent concessioners, even though these awards were barred under relevant statutory provisions and regulations requiring rejection of the incumbents' proposals. NPS's decision to make final awards of the disputed contracts to the incumbents was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### 3. NPS's Award of Disputed Contracts Had No "Reasonable" Basis

Even if the agency's actions were prohibited by statute and its own regulations, NPS has a fallback position: the agency "had a reasonable basis to proceed with the award of the contracts to the incumbents following the outcome of the CFC litigation when Eco Tour accepted its bid preparation costs as a remedy for the erroneous responsiveness determination and when the CFC left undisturbed the September 4, 2013 award decision." Defs.' Opp'n at 20–21. In this "unique

set of circumstances," *id*. at 21, NPS suggests that no regulation, including § 51.32, "expressly govern[s]," *id.*; *see also* Defs.' Reply at 9 (arguing that the regulations "do[] not contemplate the situation presented here"), and, thus, to avoid "the windfall that Eco Tour would obtain if it received the contracts in addition to its bid preparation costs," Defs.' Opp'n at 21, "NPS had a rational basis to thereafter proceed pursuant to the September 4, 2013 award determination" and "did not clearly violate any concession contracting procedure by proceeding in this manner," *id*. This convoluted argument is without merit for several reasons.

First, as a threshold matter, and most notably, the predicate for this argument—namely, that "the CFC left undisturbed the September 4, 2013 award decision," Defs.' Opp'n at 21—is plainly wrong. This argument, which is repeated throughout NPS's briefing, *id*. at 3, 13, 23–24, 30, 31; Defs.' Reply at 2, 3, fails because, as the plaintiff correctly points out, "the CFC decision in *Eco Tour* I completely eviscerated the fundamental and legal basis for NPS's September 4, 2013 selection decision." Pl.'s Opp'n at 10. To review, the September 4, 2013 decision to award the contracts to the incumbents based on their amended bids rested on the August 30, 2013 decision's critical finding the incumbents' initial proposals responsive, and therefore eligible for amendments designed to match the terms of the better offer. AR 1352, 1384 (Source Selection Memoranda, citing both August 30, 2013 determination of incumbents' "responsive proposal[s]" and June 20, 2013 letter citing terms of "better offer"). Indeed, the CFC stayed its proceedings, at NPS's request, until the agency made its final selection of concessioners, and then considered the plaintiff's challenge on an expedited schedule before the disputed contracts were executed, to hold that "NPS violated applicable law, acted arbitrarily and capriciously, and abused its discretion in concluding that incumbent concessioners . . . submitted proposals that were 'responsive' to the requirements of the prospectus and in allowing them to match the better

terms of Eco Tour's proposals for the disputed contracts." *Eco Tour I*, at 11.  Thus, the specific

reasons justifying the September 4, 2013 selection decision – that the incumbents submitted

responsive proposals and exploited the opportunity to match the plaintiff's better terms – were

found to be illegal.  The CFC further found that "there is a substantial chance that Eco Tour

would have been awarded the disputed contracts if not for the errors alleged in the amended

complaint."  *Id*. at 33, 44.

This CFC decision narrowly constrained NPS's next actions:  under the mandates of the

applicable statute and regulations, at a minimum, NPS was required to reject the incumbents'

proposals.  *See* 16 U.S.C. § 5952(8)(B)(iii) ("The Secretary shall reject any proposal, regardless

of the franchise fee offered, if the Secretary determines that . . . *the proposal is not

responsive*…"(emphasis added)); 36 C.F.R. § 51.31 (requiring rejection of incumbent's non-

responsive proposal).  Instead, NPS proceeded to execute the disputed contracts with the

incumbents, notwithstanding that those contracts were predicated on a series of statutory and

regulatory violations.[10]

Second, NPS's contention that its regulations should somehow be deemed ambiguous and

the disputed contract awards "rational" in the unique circumstances presented in this case is

without merit.  The governing statute and NPS regulations apply to situations, as here, where an

incumbent concessioner has submitted a bid for a concession contract, and explicitly addresses

---

[10]     NPS's criticism of the plaintiff for purportedly failing to challenge the September 4, 2013 selection
decision only demonstrates the agency's misunderstanding of the repercussions flowing from the CFC decision.  *See*
Defs.' Opp'n at 7 ("Eco Tour did not challenge the agency's September 4, 2013 determination . . . ."); *id*. at 16 ("Eco
Tour did not challenge in the CFC lawsuit, and does not directly challenge here, the September 4, 2013 award
decisions that were the basis for the award of the contracts to the incumbent concessioners in July 2014.").  By
successfully challenging the underlying prerequisites for the selection decision, the plaintiff needed to do no more.
By operation of the applicable statutes and regulations, the CFC decision required rejection, not selection, of the
incumbents' proposals.  *See* Pl.'s Opp'n at 11 n. 2 (explaining that "[g]iven the CFC ruling, there was no reason for
Eco Tour to thereafter file a second lawsuit seeking to invalidate this September 4, 2013 selection decision because
the CFC decision clearly invalidated it.").

what must happen when the bid is either responsive or non-responsive. When an incumbent has submitted a non-responsive bid, that bid must be rejected. *See* 36 C.F.R. § 51.31. The fact that the regulations do not discuss what happens when a non-incumbent bidder has received some judicial relief is irrelevant: NPS remains bound by the regulation requiring rejection of a non-responsive proposal from any bidder, including incumbent concessioners. In other words, the purportedly unique circumstance presented in this case is merely that the CFC, rather than NPS, found the incumbents' proposals to be non-responsive. This finding, at a minimum, should have sent NPS back to the proverbial drawing board with a new solicitation of bids, rather than proceeding apace to execute the disputed contracts. The fact that the CFC also held that the plaintiff was prejudiced and entitled to at least monetary relief—several months before NPS actually executed the disputed contracts—is unrelated to the regulatory bar on the agency's consideration of non-responsive bids for concession contracts. *See* Pl.'s Opp'n at 12 (noting "even if Eco Tour had elected a remedy and was powerless to stop NPS from awarding the contracts," this was "no excuse for NPS proceeding to award the contracts to its incumbents because . . . the law still prohibited any such award.").

Finally, NPS's argument that its decision to award the disputed contracts to the incumbents was based on the fact that "Eco Tour accepted its bid preparation costs as a remedy for the erroneous responsiveness determination," is unconvincing. Defs.' Opp'n at 20–21. As the plaintiff correctly points out, "even if Eco Tour had elected a remedy, that action by Eco Tour could not possibly have converted the preferred incumbents' non-responsive proposals into responsive proposals, which they had to be in order for NPS to legally award the contracts to the incumbents under the applicable regulations." Pl.'s Opp'n at 2. NPS does not directly address this cogent position, but instead reasons that when the plaintiff accepted reimbursement of costs

incurred for its unsuccessful bids for Contracts 24 and 32, not only had the plaintiff elected a remedy "upon which NPS could justifiably rely," but also "any error in the process had been remedied in accordance with the ruling of the CFC." Defs.' Opp'n at 31. As a result, in NPS's view, the agency "was required to award the contracts to the incumbent concessioners because they timely submitted amended proposals." *Id.* at 21.

NPS's reasoning essentially asserts, in a different guise, the same election-of-remedies defense previously rejected by this Court in denying the agency's motion to dismiss. *See infra* Part III.B. Among the flaws in this reasoning is that the plaintiff actually sought, as *complete* relief before the CFC, injunctive relief in the form of a remand for NPS to correct its responsiveness finding about the incumbents' proposals, *Eco Tour I*, 114 Fed. Cl. at 42, but the CFC agreed with the argument presented by NPS "that the court lacks authority to grant Eco Tour's requested injunctive and declaratory relief 'because 28 U.S.C. § 1491(b) does not apply to concession contracts, and 28 U.S.C. § 1491(a) provides for only monetary relief,'" *Eco Tour I*, at 39–40 (quoting from defendants' briefing before CFC).[11] Consequently, the plaintiff was "precluded from obtaining injunctive and declaratory relief," *id*. at 42, and "limited to an award of damages in the form of bid preparation costs," *id*. at 40. The CFC's correction of the NPS's erroneous treatment of the incumbents' proposals triggered the statutory and regulatory requirement of rejection of those proposals and presented NPS with two alternatives: either award of the contracts to plaintiff, as the best offeror, or re-solicitation of bid proposals. *See* Pl.'s Opp'n at 11 n.2 (noting that "[a]s a result of the CFC's decision, NPS had two legal options

---

[11]     Ironically, having prevailed on this argument before the CFC, NPS, in an about-face, suggests now that the CFC had authority to issue a remand, under either 28 U.S.C. § 1491(a)(2) or USCS Claims Ct. R. 52.2(a)-(b)(1), but simply declined to exercise that authority. *See* Defs.' Opp'n at 9 n. 8. Contrary to this characterization of the CFC's holding, the CFC made its reasoning clear that it believed the plaintiff's requested remand was "beyond the scope of" its authority. *Eco Tour I*, 114 Fed. Cl. at 42.

going forward: (1) award the contracts to Eco Tour; or (2) cancel the solicitation.").  In any event, nothing in the CFC decision intimates that the errors in the bidding process were cured by reimbursement of the plaintiff's costs; rather, this remedy simply addressed, at least partially, the prejudicial harm to the plaintiff "resulting from [NPS's] arbitrary and capricious action."  *Eco Tour I,* 114 Fed. Cl. at 43.  Although the CFC was silent about the next steps that NPS was required to take to remedy the agency's errors in considering the incumbents' non-responsive proposals and allowing amendments to make the proposals responsive and to match the better offer, as discussed above, the applicable statute and regulations made clear that these proposals were ineligible for final awards.  In short, any reliance by NPS on the plaintiff's acceptance of a monetary award as curing any of its errors during the bid process was entirely misplaced.

Finally, NPS's argument still makes little sense given the chronology of events.  NPS insists that the "final decision" to award the disputed contracts to the incumbent concessioners was made on September 4, 2013.  Defs.' Opp'n at 23–24.  Since the plaintiff was not adjudged entitled to reimbursement of its costs until after that date, in November 2013, and was not actually reimbursed until even later, in the final judgment entered in April 2014, NPS simply could not have understood the plaintiff to have obtained any, let alone "complete," relief in September 2013, when NPS says the award decision was made.  In short, NPS cannot justify its decision to permit the incumbents to amend their proposals in September 2013 because the agency believed then that the plaintiff had received an adequate remedy for the agency's violation of the APA, when the CFC did not rule until November 2013 and the plaintiff did not receive reimbursement for its bid costs until the following year, in April 2014.

*       *       *

The Court holds that NPS's decision to permit the incumbent concessioners to amend their non-responsive bids was contrary to the plain meaning of the relevant statute and regulations and, therefore, arbitrary, capricious, an abuse of discretion and contrary to law. The incumbents' bid proposals were non-responsive, rendering the incumbents' proposals ineligible for consideration and the incumbents' ineligible for the opportunity to meet the better terms of the plaintiff's proposal. NPS's decision, even after the CFC held that the incumbents' bids were non-responsive, to nonetheless award the disputed contracts to the incumbent concessioners was wrong.

## B.     NPS'S REQUEST FOR RECONSIDERATION OF DISMISSAL MOTION IS DENIED

Even if the agency's award of the disputed contracts to the incumbent concessioners is found to be illegal under the APA, NPS nonetheless contends this suit is precluded under the "election of remedies" doctrine by rehashing its previously rejected argument that the plaintiff has "already elected its remedy in the CFC." Defs.' Opp'n at 17. Specifically, NPS asks the Court to "reconsider its prior ruling" denying NPS's motion to dismiss, contending that this ruling was predicated on two "erroneous" allegations proffered by the plaintiff, which allegations now at the summary judgment stage need no longer be assumed to be true. *Id* at 27–32. These two purportedly "erroneous" allegations are "that: (1) 'the NPS had not yet finalized its decision to award the disputed contracts to the incumbent concessioners while the CFC action was still pending' and (2) 'to the extent deemed necessary' any contracts awarded under this action could address any prior partial relief received by Eco Tour pursuant to the CFC[] lawsuit." *Id*. at 22 (quoting *Eco Tour II*, 174 F. Supp. 3d at 334). The summary judgment record, however, does not make NPS's argument regarding application of the "election of remedies" doctrine any more persuasive.

**1.**     **Plaintiff Did Not Delay Seeking Injunctive Relief**

The plaintiff characterizes as "completely wrong" NPS view that "its September 3, 2013 [sic] selection decision was a final award," Pl.'s Opp'n at 42; *see also id.* at 4 ("[A]t the time of the CFC ruling, NPS had not awarded the contracts."), since "the final award decision was not made until July 16, 2014, when NPS decided not to cancel the solicitation but instead to sign the illegal contracts, which decision was made well after the CFC invalidated NPS's September 4, 2013 selection decision," *id.* at 39. According to the plaintiff, "NPS's regulations make it very clear that NPS has not made a final award decision until it actually signs the contract (which it did on July 16, 2014)," Pl.'s Opp'n at 39 (citing NPS regulations 36 C.F.R. §§ 51.3, 51.20), and, consequently, the plaintiff "could not have filed an APA action prior to July 16, 2014," *id.* NPS counters that the plaintiff's focus on the July 2014 final awards is incorrect since the plaintiff should have sought "injunctive relief under the APA based on the September 4, 2013 award decision," while the CFC suit was pending. Defs.' Opp'n at 23. The agency suggests that the plaintiff could have challenged this September 2013 source selection, for example, by "requesting to stay that [CFC] lawsuit before judgment was entered and seek relief in District Court," *id.* at 26, or "ask[ing] that [CFC] vacate, or hold in abeyance, its November 2013 decision while Eco Tour pursued injunctive relief in District Court to address the September 4, 2013 award decision," *id.* at 31.

Regardless of which decision, the September 2013 source selection decision or the July 2014 final award of the disputed contracts, constitutes the requisite final agency action to support an APA challenge, the principle thrust of NPS's argument is that the plaintiff's election to obtain the CFC's monetary judgment delayed consideration of the plaintiff's instant request for injunctive relief to either stop or to rescind the final award of the disputed contracts. Defs.' Opp'n at 26 (faulting the plaintiff for "delay in seeking injunctive relief in an appropriate

forum"). The plaintiff counters that "it would be unfair to find fault with the conduct of Eco Tour," which acted promptly and vigorously, and also exhausted its financial resources, in filing a bid protest seeking an injunction in what appeared based on existing case law to be the appropriate forum, the Court of Federal Claims, only to have that court for the first time determine that it could not issue injunctive relief in a bid protest challenging an NPS concession contract." Pl.'s Opp'n at 39–40.

Even if NPS were correct that the plaintiff could have sought injunctive relief in this Court based on the September 2013 selection decision, Defs.' Opp'n at 23, the agency draws the wrong conclusion that the plaintiff unnecessarily delayed in seeking injunctive relief. The plaintiff sought both monetary *and* injunctive relief before the CFC, *Eco Tour I*, 114 Fed. Cl. at 11, and could not have known until November 2013, that the CFC accepted the agency's arguments that the CFC lacked jurisdiction to issue the requested injunctive relief. Moreover, in view of the CFC holdings regarding the non-responsiveness of the incumbents' proposals, the September 4, 2013 selection decision was a nullity since the critical bases for that decision were found to be arbitrary and capricious. At that point, the plaintiff had little reason to seek to enjoin that selection decision. Instead, under the mandates of the governing statute and regulations, if NPS did not award the disputed contracts to the plaintiff as the best offeror, NPS should have initiated a new solicitation of concession proposals, in which new solicitation the plaintiff may have chosen to participate, after receiving monetary reimbursement for its participation in the original flawed competition. If events had so transpired, the agency's acute concern over the plaintiff obtaining a windfall would have been eliminated.

The plaintiff's goal since submission of its bid proposals was to obtain the disputed contracts, not a windfall monetary award. Indeed, the plaintiff beseeched the agency simply to

comply with its own regulations and offered to forgo execution of the CFC judgment in exchange for the disputed contracts, but NPS declined, expressing the view that it was "not possible" to award the contracts to the plaintiff. AR 00011 (Letter, dated June 20, 2014, from Regional Director, NPS Intermountain Region to plaintiff's President, acknowledging plaintiff's efforts). At bottom, NPS urges this Court to find that, after prevailing on the merits before the CFC, the plaintiff should have sought injunctive relief in this Court because the plaintiff should have anticipated and expected that NPS would ignore the clear import of the CFC's ruling and proceed to violate its governing statute and its own regulations. It cannot be the case that disappointed bidders are expected to make that assumption of government agencies, especially in light of a clear court ruling. Consequently, the plaintiff cannot be expected to have filed suit in this Court seeking injunctive relief after the CFC's ruling but before NPS executed the disputed contracts with the incumbent concessioners. NPS's argument that the plaintiff failed to challenge the September 4, 2013 decision in a timely manner is rejected.

### 2. Equitable Relief May Be Fashioned To Avoid A Windfall To the Plaintiff

To bolster its argument that this Court should reconsider NPS's selection-of-remedies defense, the agency next asserts that "there is no basis for Eco Tour's representation that any contracts awarded in this action could provide reimbursement to NPS of the bid preparation costs that NPS paid to satisfy the CFC judgment," Defs.' Opp'n at 29; *see Eco Tour II*, 174 F. Supp. 3d at 335 (finding that "any contract awarded under this action c[an] address any prior partial relief received by Eco Tour"). As support for this assertion, NPS relies on two NPS regulations raised for the first time in this summary judgment briefing. Since neither of the cited regulations,

however, would bar the fashioning of equitable relief to address any potential windfall to the plaintiff, this argument is unavailing.[12]

The first regulation cited by NPS as precluding the use of any mechanisms to provide equitable relief to the plaintiff while avoiding a windfall is 36 C.F.R. §51.19. *See* Defs.' Opp'n at 29. This regulation provides, in pertinent part: "[e]xcept for incorporating into the concession contract appropriate elements of the best proposal, the Director must not award a concession contract which materially amends or does not incorporate the terms and conditions of the concession contract as set forth in the prospectus." According to NPS, amending the concession contract "to allow for the reimbursement to the government of the previously paid bid preparation costs" would amount to a material change in the contract. Defs.' Reply at 11; *see also* Defs.' Opp'n at 24 (citing 36 C.F.R. § 51.19). Yet, the prospectus did not actually require a specific franchise fee, but only required a fee of "at least" 3% of gross revenues or $500, whichever was greater. AR 24. As the plaintiff points out, the offered franchise fee of 4.25% "could be increased above what Eco Tour bid in the first year (or annually over the contracts' full term) to include the $36,250 in funds which NPS previously paid to Eco Tour," by simply stating that the plaintiff agrees to pay the $36,250, plus the 4.5% franchise fee, which results in no material amendment to the prospectus or proposed contract. Pl.'s Opp'n at 16. This plan

---

[12]     NPS notes that it stands by its original argument that "the Court cannot order the agency to award the contracts to Eco Tour because the decision to award a contract is within the agency's discretion." Defs.' Opp'n at 24 n.13. While generally an agency may not be compelled to take discretionary action, s*ee Norton v. South Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004) (when action is left to an agency's discretion, a court "has no power to specify what the action must be"), an exception allows such an order in the government contracting context when "it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award.'" *Delta Data Sys. Corp. v. Webster* ("*Delta Data*"), 744 F.2d 197, 206 (D.C. Cir. 1984)); *see also LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003) (same, quoting *Delta Data*). This is precisely the situation here. Given that NPS regulations required that the disputed contracts be awarded to the bidder submitting the "best" proposal, and that the plaintiff submitted the "best" proposal for both contracts, compared to non-responsive proposals submitted by the incumbents, but for NPS's arbitrary and capricious actions, the incumbents' proposals should have been rejected and the disputed contracts would have been properly awarded to the plaintiff. Consequently, the Court has the power to direct the award of the contracts, should the plaintiff be found entitled to such relief.

would simply return the plaintiff to the position to which it was entitled absent the agency's violation of the APA, without any material amendment to "the terms and conditions of the concession contract," under § 51.19. Thus, this regulation cannot be used to shield NPS from providing a full remedy to the plaintiff prejudiced by the agency's invalid bidding process.

NPS likewise cites a second regulation, titled "Simplified Concession Contracts; Revision," which outlines standard terms for agency concession contracts, as barring any attempt to modify a proposed franchise fee. Defs.' Reply at 11–12 & n.5. According to NPS, adjustment of a franchise fee is only permitted in light of "extraordinary, unanticipated changes," a term that is "specifically defined in the applicable regulations and does not include reimbursing the agency for previously paid bid preparation costs." *Id*. at 12 n.5 (citing 65 Fed. Reg. 44,894 at 44,902– 03). The cited regulation provides "simplified versions of the standard concession contract," which "serve as a guideline for the form of concession contracts used to authorize smaller concession operations." 65 Fed. Reg. 44,894 at 44,894. One optional term would authorize "a reconsideration and possible subsequent adjustment of the franchise fee," in the event of "extraordinary, unanticipated changes," which is defined as "unanticipated changes from the conditions existing or reasonably anticipated before the effective date of this CONTRACT which have or will significantly affect the probable value of the privileges granted to the Concessioner by this CONTRACT." *Id*. at 44,903 (capitalization in original).[13]

As an initial matter, given that the plaintiff has no contract with NPS, this language restricting when a franchise fee amendment would be authorized for an effective contract, is currently inapplicable. Furthermore, even if the cited regulation were somehow pertinent here, it is unhelpful to NPS. This optional contract term actually authorizes adjustments to franchise

_____

[13] This language is incorporated into the disputed contracts executed with the incumbent concessioners. AR 00025-26, 00059-60.

fees, and while not explicitly referencing an adjustment to allow a bidder to reimburse judicially ordered bid preparation costs, the definition does not exclude it either. Tellingly, NPS does not actually quote any of the language defining "extraordinary, unanticipated changes" in its briefing, but relies entirely on its own characterization that the definition "does not include reimbursing the agency for previously paid bid costs." Defs.' Reply at 12 n.5.[14]

In sum, NPS has presented no persuasive argument based on its regulations that preclude conditioning the award of the injunctive relief sought by the plaintiff on repayment of the funds the plaintiff has already received, resolving any concerns about the plaintiff receiving a windfall. Accordingly, NPS's position that the Court should reconsider its prior denial of the agency's election-of-remedies defense and grant it summary judgment is rejected.

## C.    FASHIONING EQUITABLE RELIEF ABSENT INCUMBENT CONCESSIONERS

The plaintiff has succeeded on the merits but that fact does not automatically entitle the company to injunctive relief as of right. *Winter v. NRDC, Inc.*, 555 U.S. 7, 32 (2008) ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."). To demonstrate entitlement to injunctive relief, a party "must make a clear showing that four factors, taken together, warrant relief: [] success on the merits, [] irreparable harm in the absence of [injunctive] relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC,* 831 F.3d 500 (D.C. Cir 2016)); *see also see also Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 694 (D.C. Cir.

---

[14]    NPS rejects the plaintiff's simple solution for avoiding a windfall by conditioning any equitable relief on the return to NPS of the funds received as reimbursement for the plaintiff's bid costs. Pl.'s Opp'n at 15-16. NPS contends without support that the CFC's "final judgment would then become an outstanding liability of NPS" and returning the money would "negate the binding judgment issued by the CFC." Defs.' Opp'n at 25. If NPS is correct on this point, then structuring the plaintiff's contractual obligations with NPS to ensure reimbursement of the funds would be the only option.

2015) (discussing entitlement to a permanent injunction). "If a less drastic remedy . . . [is] sufficient to redress [the] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). Although the plaintiff clearly meets three factors—success on the merits, irreparable harm, and accord with the public interest—evaluating the balance of the equities poses a particular problem, as it highlights the impact that any equitable relief may have on the incumbent concessioners, who are not parties to this case.

### 1. The Plaintiff Satisfies Three Factors For Injunctive Relief

The plaintiff has prevailed on the merits of its claims before this Court, as it did before the CFC, and hence has met the first factor for injunctive relief. *See supra* Part III.A.2. The plaintiff has also demonstrated that its injuries are irreparable for at least two reasons. First, the harm to the plaintiff is certain but difficult to value. Such harm is irreparable. *CSX Transp. v. Williams*, 406 F.3d 667, 673 (D.C. Cir. 2005) (quoting *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)); *see also Bell Helicopter Textron, Inc. v. Airbus Helicopters*, 78 F. Supp. 3d 253, 274–75 (D.D.C. 2015) (damages that "defy attempts at valuation" are irreparable (citing *i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 862 (Fed. Cir. 2010) ("Difficulty in estimating monetary damages is evidence that remedies at law are inadequate."). A concessioner is not guaranteed any particular profit under the concession contract and, thus, determining the value of what the plaintiff has lost in profits is difficult, if not impossible.

Second, if NPS had properly rejected the non-responsive proposals of the incumbent concessioners and awarded the disputed contracts to the plaintiff with the "best proposal," the plaintiff would be eligible for treatment as a preferred offeror in the future in the next round of contracting. *See* 36 C.F.R. § 51.36 ("A concessioner is a preferred offeror if . . . [among other things], [t]he concessioner was a satisfactory concessioner during the term of its concession

contract."). Thus, as a consequence of NPS's improper actions, the plaintiff has been put in a less favorable position as a bidder for the NPS contracts than it would have been as an incumbent concessioner. Absent equitable relief, this injury simply will not be redressed.

The plaintiff has also demonstrated that the public interest favors granting relief. As the plaintiff points out, not only is the public interest served by ensuring that "the government obtains the most advantageous contracts by complying with the procedures which Congress and applicable regulations have provided," Pl.'s Opp'n at 27 (quoting *Delta Data Sys. Corp.*, 744 F.2d at 206), but Congress has expressed a clear policy preference against rights of renewal absent specified, exceptional circumstances, *id.* at 29 (citing *Circle Line-Statue of Liberty Ferry, Inc. v. United States*, 76 Fed. Cl. 490, 491 (2007) ("Having found that true competition simply did not exist in the award of concession contracts, Congress reversed the renewal preference policy set out in [previous legislation] by directing that 'the Secretary shall not grant a concessioner a preferential right to renew a concessions contract, or any other form of preference to a concessions contract,'" except in limited circumstances (quoting 16 U.S.C. §5952(7)). Even in the limited circumstances where preferential right of renewal is statutorily authorized, an incumbent concessioner is eligible to exercise that right "only if the concessioner has submitted a responsive proposal." 16 U.S.C. §5952(8).

Nevertheless, granting the plaintiff injunctive relief in the form of rescission of the disputed contracts and either an award to the plaintiff or resolicitation of proposals would, as NPS indicates, "be potentially disruptive to the public." Defs.' Opp'n at 22. NPS does not dispute, however, that equitable relief may be fashioned to avoid such concerns, for example, by "delay[ing] granting injunctive relief until after the upcoming winter season such that Eco Tour would begin operating in the winter season of 2017-2018." Defs.' Reply at 16. Consequently,

concerns over disruption of concessioner services to the public, while legitimate, may be adequately addressed and do not outweigh the weighty public interests in ensuring that federal agencies engage in fair competitive bidding processes that comport with both binding statutory and regulatory law and judicial rulings.

### 2.    Balance of Equities Favors the Plaintiff

The parties vigorously dispute whether the equities at issue entitle the plaintiff to its requested injunctive relief.  The plaintiff, having clearly succeeded on the merits, asserts its diligence in pursuing relief, not only before this Court, but also before the CFC and through non-litigation avenues, as support for the conclusion that the equities favor granting an injunction. Pl.'s Opp'n at 39–40 (noting that plaintiff "acted promptly and vigorously, and also exhausted its financial resources in pursuing relief").  In opposition, NPS raises three arguments as to why the equities are against the plaintiff, but each of these arguments fall short.

First, NPS asserts that "the equities do not favor Eco Tour because it did not act expeditiously in seeking injunctive relief from this Court," Defs.' Opp'n at 22, but, as discussed *supra* in Part III.B.1, NPS's repeated argument about the plaintiff's delayed action is unavailing. The cases relied upon by NPS for this assertion are inapposite.  Defs.' Opp'n at 23–26.  For example, NPS cites *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838 (D.C. Cir. 1982), for the propositions that success on the merits does not necessitate an injunction, Defs.' Opp'n at 19, and that partial performance of a contract is a substantial factor in denial of injunctive relief, *id*. at 23.  In that case, however, the D.C. Circuit reversed the district court's denial of an injunction and rejected the claim of purported delay by a contract bidder on facts analogous to this case.  *Id.* at 846.[15]  In *Gull Airborne*, a contract bidder challenged a decision by

---

[15]      NPS also relies on *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975), where, a 44-delay in seeking an injunction was found to be "inexcusable," warranting denial of injunctive relief.  Defs.' Opp'n at 23.

the Navy to award a contract, first by bringing a challenge directly to the Navy, then in the General Accounting Office, and finally in federal court. *Id.* at 840–41. The district court denied injunctive relief, holding that the plaintiff delayed too long in filing suit in federal court, but the Circuit reversed, noting with approval the plaintiff's "persistent attempts to use the administrative process to resolve its dispute," recognizing that "it would be an injustice to unsuccessful bidders if we now penalized them merely for exhausting th[eir] administrative remedies," and holding that the plaintiff's "many attempts to receive administrative relief served to put the government on notice that [the plaintiff] was not sleeping on its rights." *Id.* at 844 & n.8. Similarly, the plaintiff in this case brought suit in the CFC almost immediately after being informed that NPS intended to award the disputed contracts to the incumbent concessioners, continued to pursue relief through non-litigation means, and filed suit in this Court after its efforts proved unsuccessful. Under *Gull Airborne*, the plaintiff's multiple actions to protect its interests militate in favor of injunctive relief.[16]

---

Unlike the plaintiff in this case, however, the plaintiff in *Fund for Animals* waited until after the issue was moot to file suit. Thus, the deciding factor in that case was not the length of the delay but the context of the delay. Similarly, NPS's reliance on *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, Defs.' Opp'n at 24, 26 (citing 48 F. Supp. 3d 87 (D.D.C. 2014)), is misplaced. There, this Court held that a plaintiff unreasonably delayed by seeking a preliminary injunction "more than thirty days after the defendants began engaging in the activity the plaintiffs" sought to enjoin, and asked to postpone the injunction hearing indefinitely, or alternatively, for at least ninety-five days. *Id.* at 90-92. Unlike the plaintiff in *Open Top*, however, as explained *supra* Part III.B.1, the plaintiff did not delay challenging NPS's actions.

[16]    In addition to challenging the length of time between the conclusion of the CFC proceedings and initiation of this suit, NPS takes issue with the order in which the plaintiff's suits were filed. NPS argues that the plaintiff was required to first bring suit in the district court, and if unsuccessful in that form, [] then file in the CFC to obtain monetary relief." Defs.' Opp'n at 11 n.9 (citing *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 318 (2011)). NPS is wrong. The Supreme Court in *Tohono O'Odham* held that 28 U.S.C. §1500, which strips the CFC of jurisdiction over "any claim for or in respect to which" a plaintiff has a pending action in "any other court," does not permit simultaneous actions in the CFC and district court regardless of relief sought. 563 U.S. at 318 ("The holding here precludes the CFC from exercising jurisdiction over the Nation's suit while the District Court case is pending."). Since neither court has the jurisdiction to provide complete relief over certain challenges to agency action, the *Tohono O'Odham* Court sanctioned successive suits before the CFC and district court, barring statute of limitations issues. *See id.* at 316–18; id. at 322 ("[A] plaintiff seeking both money damages and injunctive relief to remedy distinct harms arising from the same set of facts may be forced to file actions in both the CFC and federal district court." (Sotomayor, J., concurring)); *see also Havens v. Mabus*, 759 F.3d 91, 97-98 (D.C. Cir. 2014) (noting that claim preclusion only bars a subsequent lawsuit "involving the same claims or cause of action" where a "final valid judgment on the merits" was issued by a "court of competent jurisdiction" to provide complete relief); 18B

Second, NPS argues that the plaintiff created concerns about a potential windfall through its litigation choices and "the equities do not favor Eco Tour because it . . . would receive a windfall if it was awarded the contracts."  Defs.' Opp'n at 22.  Not only has this Court now rejected NPS's windfall argument twice, *see Eco Tour I*, 174 F. Supp. 3d at 336; *supra* Part III.B.2, but NPS fails to recognize its own contributions to creating the situation in which it is now mired, *see Lockheed Martin Corp. v. United States,* 833 F.3d 225, 240 (D.C. Cir. 2016) (rejecting government's "double-payment concern" as to an agreement made with private contractor under the Comprehensive Environmental Response, Compensation, and Liability Act because "it [wa]s a problem of the government's own making"); *Crassociates, Inc. v. United States*, 95 Fed. Cl. 357, 391 (2010) (noting that asserted harms to the government and the awardee were "of the [government]'s own making" and thus did not weigh heavily in injunctive relief analysis).  Shortly after the November 2013 CFC ruling, the plaintiff offered to forgo payment of the CFC judgment in exchange for award of the disputed contracts to the plaintiff as the best offeror, a solution NPS rejected as "not possible."  AR 00011 (Letter, dated June 20, 2014, from Regional Director, NPS Intermountain Region to plaintiff's President).  After rejecting the plaintiff's proposal and rather than cancelling and resoliciting the contracts—a course of action that would have precluded any windfall concerns—NPS then went on to violate its own clear regulations and award the contracts to the incumbents.  By taking this course of action, NPS not only inflicted irreparable injury on the plaintiff, but also unnecessarily fueled concern over a potential windfall to the plaintiff and contributed to a situation where the

Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4412 (3d ed.) ("[A] litigant should not be penalized for failing to seek unified disposition of matters that could not have been combined in a single proceeding.").  While the *Tohono O'Odham* Court did not address the order in which such successive suits may be brought, NPS's argument that filing suit first in the CFC "creates the potential for a windfall," Defs.' Opp'n at 11, is no more than a rehash of its inevitable windfall argument, which this Court has rejected.  *See infra* Part III.B.2.

contractual expectations of the incumbent concessioners are at risk. The agency's decisions, beginning with its summary rejection of the plaintiff's legitimate concerns over the non-responsiveness of the incumbents proposals in July 2013, and ending with the final awards of the disputed contracts to the incumbents, despite the CFC's rulings invalidating the legal basis for those awards, created the current quagmire and pushes the equities more in favor of the plaintiff.

Finally, NPS argues that disrupting the contracts "could subject the government to potential litigation from one or both of those concessioners, which also would be contrary to the public interest." Defs.' Reply at 16–17. This concern is purely speculative and, consequently, does not outweigh the concrete and real equities favoring the plaintiff. *Comm. of 100 on the Fed. City v. Foxx*, 87 F. Supp. 3d 191, 220 (D.D.C. 2015) (holding that "balance of the equities tip[ped] decidedly" against party whose asserted harms were "speculative at best"); *Debt Buyers' Ass'n v. Snow*, 481 F. Supp. 2d 1, 15 (D.D.C. 2006) (refusing to weigh asserted speculative harm in injunctive relief analysis); *Tozzi v. EPA*, 148 F. Supp. 2d 35, 50 (D.D.C. 2001) (weighing, "in balancing interest between the parties," demonstrated harm more heavily than "speculative reputational and economic loss").

In sum, none of NPS's arguments provide a reason to deny the plaintiff equitable relief and, to the contrary, NPS's concerns about a windfall to the plaintiff and possible litigation with the incumbent concessioners are problems of its own making. Thus, on balance between the parties in this case, the equities clearly favor the plaintiff.

### 3. Fashioning Appropriate Equitable Relief Absent Incumbent Concessioners and Without Detailed Proposals

Two related concerns require discussion and supplemental briefing from the parties before injunctive relief may be awarded in this case: first, whether the incumbent concessioners must be given an opportunity to participate in this litigation and, second, specific proposals for

mitigating any adverse impact of equitable relief on the public and the incumbents.  Each of these concerns are addressed *seriatim* below.

### (a) Additional Briefing Required Regarding Absent Incumbent Concessioners

In assessing the equities for requested injunctive relief, the impact on any interested third parties must be considered.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (explaining that party seeking preliminary injunctive relief must show, *inter alia*, "that an injunction would not substantially injure other interested parties").  Since the plaintiff seeks rescission of the disputed contracts, the incumbent concessioners' substantial interests in those contracts are directly implicated in their absence.  Yet, the parties only briefly mention this possible impact on the incumbent concessioners' contractual interests, and none addresses whether those interests are sufficiently significant to require that the incumbents be joined in this action, under Federal Rule of Civil Procedure 19.  For example, NPS's limited discussion only asserts, without elaboration, that "invalidat[ing] the contracts . . . could harm the incumbent concessioners who have been performing under the contract for two years and have incurred costs in reliance on those contracts."  Defs.' Opp'n at 22 (citing Defs.' Mot., Ex. 4, Decl. Jennifer Parker, dated July 28, 2016 ¶ 28, ECF No. 27-4 ("Both concessioners signed their contracts with the understanding that they would be able to operate their business in the park for ten years," and the concessioners "hire and train staff and purchase necessary supplies and equipment during the off season.")).  The plaintiff's discussion is similarly brief, positing that the requested equitable relief "would not be unfair to [the] incumbents" because they "have actually benefitted by obtaining two additional years of profits," and discounting as "mere[] speculat[ion]" that invalidating the contracts could harm the incumbents."  Pl.'s Opp'n at 36.

The parties have not moved to join the incumbents as parties to this suit, nor have the incumbents sought to intervene. Nonetheless, courts have an "independent duty to raise a Rule 19(a) issue *sua sponte*." *Cook v. FDA*, 733 F.3d 1, 6 (D.C. Cir. 2013) (internal quotation and alteration omitted). Federal Rule of Civil Procedure 19 provides that "[a] person. . . *must* be joined as a party if . . . that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may, as a practical matter impair or impede the person's ability to protect the interest or leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." FED. R. CIV. P. 19(a)(1)(B)(i) (emphasis added). Rule 19 mandates that "[i]f a person has not been joined as required, the court *must* order that person be made a party." Fed. R. Civ. P. 19(a)(2) (emphasis added). Thus, if the required party has not chosen to intervene, the rule provides that the party "who refuses to join" a case in which they are a required party may nevertheless be joined. *Id.*

Determining whether a person is a required party in a lawsuit is a fact-specific inquiry that can only be determined in the context of particular litigation. *Rep. of Philippines v. Pimentel*, 553 U.S. 851, 863 (2008) ("[T]he issue of joinder can be complex, and determinations are case specific."). While "Rule 19 precedent is admittedly scant," *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, *9 (D.C. Cir. 2017), in actions involving contractual rights, courts have frequently found that the parties to a contract are required parties within the meaning of Rule 19, *see, e.g.*, *Ward v. Deavers*, 203 F.2d 72, 75 (D.C. Cir. 1953) ("There is a general rule that where rights sued upon arise from a contract all parties to it must be joined."); *Corsi v. Eagle Publ'g, Inc.*, No. 1:07-CV-02004ESH, 2008 WL 239581, at *4 (D.D.C. Jan. 30, 2008) ("[M]any court decisions [] have concluded that an absent contracting party. . . must be joined under Rule

19(a)." (citing cases)); [17] *see also* 5C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 1613 (3d ed. 2017) ("In cases seeking reformation, cancellation, rescission, or otherwise challenging the validity of a contract, all parties to the contract probably will have a substantial interest in the outcome of the litigation and their joinder will be required."); *cf. Nanko Shipping, USA*, 850 F.3d at *9 (finding that assignor of contractual rights was not a necessary party under Rule 19).

In the event that the plaintiff is granted its requested equitable relief of rescission and award to the plaintiff of the disputed contracts, the incumbent concessioners' interests in those contracts would be "impair[ed] or impede[d]." Yet, their contractual rights are being considered without their participation. While the purely legal question of whether NPS violated the APA may be resolved without requiring the joinder of the incumbent concessioners, *see Ervin & Assocs., Inc. v. Dunlap*, 33 F. Supp. 2d 1, 11-12 (D.D.C. 1997) (holding, in a government contract dispute, that the court could resolve "constitutional and statutory dispute[s]" without joinder of non-party contract recipients), the incumbents' interests are inextricably bound up in the fashioning the appropriate relief to which the plaintiff is entitled to remedy the agency's violation of the APA. Given this circumstance, the parties are directed to explain satisfactorily whether joinder of the absent incumbents as parties to this lawsuit is required under Rule 19 at this stage of the litigation. As the D.C. Circuit recently explained, this rule operates to "promote[] fair treatment of nonparties in certain circumstances where their interests, and particularly their due process rights, are at risk from litigation between others." *Nanko Shipping,*

---

[17]     The language of Rule 19 was amended in 2007 "as a part of the general restyling of the Civil Rules . . . These changes are intended to be stylistic only. FED. R. CIV. P. 19 2007 advisory committee's note. As a result, the words "necessary" and "indispensable," which were used pre-2007," have been replaced with the word "required. *Vann v. Kempthorne*, 534 F.3d 741, 745 (D.C. Cir. 2008). Since the 2007 amendments were intended to be stylistic only, reliance on cases from both before and after the amendments is appropriate.

*USA*, 850 F.3d at *7; *see also White v. Univ. of Cal.*, 765 F.3d 1010, 1026–1027 (9th Cir. 2014)("Rule 19 is designed to protect 'a party's right to be heard and to participate in adjudication of a claimed interest, even if the dispute is ultimately resolved to the detriment of that party.'" (quoting *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir. 1992)). The interests of the absentee incumbents may be fully represented by the NPS, which has vigorously argued for the *status quo*, *see Ramah Navajo Sch. Bd. v. Babbitt*, 1996 U.S. App. LEXIS 15760, 38–41 (D.C. Cir. 1996)("If the nonparties' interests are adequately represented by a party, the suit will not impede or impair the nonparties' interests, and therefore the nonparties will not be considered 'necessary.'"), but if those incumbents should nevertheless be joined, the parties should address whether joinder is infeasible. Finally, "if the absentee should but cannot be joined, may the lawsuit nonetheless proceed 'in equity and good conscience'" to fashion equitable relief? *Nanko Shipping, USA*, 850 F.3d at *6–7.

While cognizant "that administrative litigation commonly inflicts drastic effects on absent third parties" and such "potential unfairness seems in accord with what we often tolerate," *National Wildlife Federation v. Burford*, 835 F.2d 305, 332–333 (D.C. Cir. 1987)(J. Williams, concurring and dissenting), Rule 19 provides not only an avenue for the inclusion of the incumbent concessioners in this case, but may in fact mandate their joinder.

### (b) Additional Briefing Required Regarding Specific Form of Equitable Relief

NPS has proposed only one solution should the plaintiff prevail on the merits of its claim in this lawsuit: that the plaintiff be denied injunctive relief entirely, thereby limiting this injured party to reimbursement for costs incurred in preparing the "best proposal" for Contracts 24 and 32. Defs.' Opp'n at 15–19 (arguing "there is discretion in the District Court to decline to consider the prayer for injunctive relief, and to leave the bidder solely to his damages remedy"

(citing *M. Steinthal & Co. Inc. v. Seamans*, 455 F.2d 1289, 1300 (D.C. Cir. 1970))); *see also Nat'l Federation Fed. Emps. v. Cheney*, 883 F.2d 1038, 1053 (D.C. Cir 1989) (holding that a successful disappointed bidder must still prove entitlement to injunctive relief (citing *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C. Cir. 1970)). NPS urges that the Court be satisfied with the *status quo*, where the agency executed the disputed contracts in flagrant disregard of the judicial finding that the bidding process was flawed and illegal as well as its own governing statute and regulations, all while refusing to consider the prevailing plaintiff's suggestions for alternative remedies to a monetary judgment. This result would be troubling not just because of the hollow victory afforded the plaintiff, but also because the message to agencies would be that violations of statutory provisions and regulations designed to ensure fairness in considering bid proposals may occur with virtual impunity, no matter the cost to the public denied the benefits of the "best" bid proposal by the best offeror.

At the same time, the plaintiff likewise proposes its preferred course of action: that the disputed contracts should be rescinded in their entirety, the plaintiff "should be awarded the contracts" by this Court, and the contracts should be "for the full 10 year terms." Pl.'s Opp'n at 35–36.[18] To minimize the impact on the incumbent concessioners and the public, the plaintiff proposes only that the termination of the disputed contracts and the directed award to the plaintiff be delayed for a limited season. Pl.'s Opp'n at 33 ("[F]or the sake of ensuring uninterrupted services to the public, Eco Tour is willing to begin operating under the contracts in the Winter Season of 2017-2018."). Given that visitors to the parks may have already made

---

[18] The plaintiff also suggests that "[i]n the alternative to explicitly directing award of the contracts to Eco Tour, the Court could issue an order declaring that NPS violated the law . . . invalidating the contracts and directing NPS to proceed in accordance with applicable regulations set out at 36 C.F.R. § 51.31 which would mean that NPS must award the contracts to the best offeror, which was the plaintiff." Pl.'s Opp'n at 35. The difference between directing the award to plaintiff and directing the award to the best offeror, which the parties agree was the plaintiff, is only one of methodology, not outcome.

reservations with the incumbent concessioners, and that the incumbents have likely incurred reliance costs in carrying out their obligations under the disputed contracts, the impact of granting the plaintiff's requested relief may have a more significant effect than the plaintiff acknowledges.[19]

Beyond retention of the *status quo*, as the agency urges, and awarding the disputed contracts directly to the plaintiff after some limited time-lag, the parties offer little guidance regarding the fashioning of an appropriate remedy. Here, even if rescission of the disputed contracts is granted either immediately or at some point in the future, the Court must consider any changes in current circumstances over the last four years that bear on the appropriate next steps, including whether the agency should be directed to award the contracts to the plaintiff, or to reconsider the original solicitation or engage in a new solicitation of bid proposals. *See, e.g., Applied Bus. Mgmt. Sols., Inc. LLC v. United States*, 117 Fed. Cl. 589, 609 (2014) (ordering reconsideration of submitted bids after setting aside contract that was awarded contrary to agency regulations); *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 401–03 (2011) (permitting agency to choose between two courses of action that would remedy the harm found, and noting that "[w]hat course of action [the agency] choose to pursue after [the] contract award is cancelled . . . is not for this court to decide."); *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 280 (2004) ("[T]he Court does not direct the Air Force to go back to square one and issue a wholly new solicitation [but instead] sets aside the selection [of the awardee] and directs the Air Force to reassess its needs, amend the Solicitation accordingly (or not) and evaluate final proposal revisions consistent with that Solicitation."); *Cardinal Maint. Serv. v. United States*, 63 Fed. Cl. 98, 111 (2004) (ordering resolicitation of improperly awarded contract, which "will

---

[19]     Local Rule 7(c) requires that "[e]ach motion and opposition shall be accompanied by a proposed order." LCvR 7(c). The plaintiff, however, did not file a proposed order along with its motion for summary judgment.

enforce a process whereby bidders can be confident that the contracts on which they bid will be the contracts which are awarded and performed" and which "will also promote the integrity of the [solicitation] process by holding the government accountable for its actions."). For example, has the agency made any improvements to the bidding process in the last few years that favor the resolicitation approach? If that approach is taken, should the incumbent concessiners be entitled to any preferences in any resolicitation? *See, e.g.*, *Naplesyacht.com, Inc. v. United States*, 60 Fed. Cl. 459, 462 (2004) (noting that awardees' contracts were "close to being substantially performed," and thus declining to grant injunctive relief," but holding that "in the event the [agency] decides to issue a solicitation for" a similar contract in the future, the incumbents were not to be afforded "any preference or advantage for having been selected for the [disputed contract]."). In addition, has the plaintiff's financial condition remained sufficiently strong to meet the financial requirements of the original prospectus for the disputed contracts? In light of the potential adverse effect that rescission of the disputed contracts may have on pending customer reservations, for what period should the incumbent concessiners be permitted to continue operating under the disputed contracts? *See, e.g., Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 798 (2009) (limiting disputed contract to a set term and voiding the option for the incumbent to extend the contract, after which a new solicitation was ordered).

In considering the myriad forms that the equitable relief to which the plaintiff is entitled may take, the Court is constrained by both the limited guidance from the parties and lack of input from the incumbent concessiners, for example, regarding the specific harms they and their customers face and mechanisms available to mitigate those harms. Thus, without supplemental briefing, the Court is unable properly to fashion equitable relief.

**IV.     CONCLUSION**

For the foregoing reasons, the plaintiff's motion for summary judgment is granted insofar as the plaintiff is entitled (1) to a declaration that NPS acted arbitrarily and capriciously and contrary to law in awarding the disputed contracts to the incumbent concessioners, in violation of the APA; and (2) to equitable relief, since the plaintiff has satisfied each factor of the injunctive relief inquiry.  Fashioning that relief, however, requires supplemental briefing from the parties addressing whether the incumbent concessioners should be joined as parties, under Federal Rule of Civil Procedure 19, and any practical considerations pertinent to the injunctive relief.  The parties are directed to confer and, by April 28, 2017, submit jointly to the Court a proposed schedule for this supplemental briefing.  The defendants' cross motion for summary judgment is denied.

An Order consistent with this Memorandum Opinion shall be filed contemporaneously.

Date: April 18, 2017

_____
BERYL A. HOWELL
Chief Judge